USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 2 4 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                             :

DIRK HAYNES,                       :

                Plaintiff,      :      06-cv-1383 (KBF)

                       :

          -v-               :      OPINION & ORDER

                       :

JOHN MATTINGLY, individually and as   :
Commissioner, et al.,           :

                       :

             Defendants.    :

                       :
------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

     As the Supreme Court has noted, family law is an area of "unusual delicacy"
where "professional judgments regarding desirable procedures are constantly and
rapidly changing," and thus, "restraint is appropriate on the part of courts called
upon to adjudicate whether a particular procedural scheme is adequate under the
Constitution." Smith v. Org. of Foster Families for Equality & Reform, 431 U.S.
816, 855-56 (1977).

     In this case, plaintiff, the administrator of the estate of a deceased kinship
foster parent, challenges the constitutionality of the State of New York's procedures
regarding the removal of kinship foster children from kinship foster homes.
Because of settlements reached over the last year, plaintiff's sole remaining claims
in this action are those against John Johnson, the former Commissioner of New
York's Office of Children and Family Services, in his individual capacity. Because
there is no material dispute of fact preventing this Court from concluding that

Johnson was not personally involved in any of the alleged constitutional deprivations or from concluding that Johnson has qualified immunity against plaintiff's claims, and mindful of the delicacy with which federal courts must approach the adjudication of matters touching on domestic relations, the Court DENIES plaintiff's motion for summary judgment and GRANTS defendant's motion for summary judgment.

I.  BACKGROUND

A.  Statutory and Administrative Background

The State of New York's foster care program is administered by New York's Office of Children and Family Services ("OCFS"), which is under the general supervision of its Commissioner. See N.Y. Soc. Serv. L. §§ 371, 383-c(4)(a), 390-a-(5), 390-f. OCFS administers the program through local services districts. N.Y. Soc. Serv. L. § 395. New York City's local services district is the Administration for Children's Services ("ACS"). Finch v. N.Y. State Office of Children & Family Servs., 499 F. Supp. 2d 521 (S.D.N.Y. 2007).

A preference for placing foster children in the care of relatives rather than non-relatives is embodied in New York law. See N.Y. Fam. Ct. Act § 1017(1)-(2)(a). To facilitate the placement of foster children with relatives, New York law exempts the relatives of foster children from certain licensing requirements and provides an expedited process for their approval as foster parents. See N.Y. Soc. Serv. L. § 375; 18 N.Y. Comp. Codes R. & Regs. tit. 18, § 443.7 (2014); Wilder v. Bernstein, 49 F.3d 69, 71 (2d Cir. 1995) ("In 1989, New York State enacted legislation requiring local

2

social service districts to search for suitable and willing relatives with whom a child in need of placement may appropriately reside, and further requiring, if such a relative is found, that the child be placed with that relative." (citations omitted)). Foster children who are placed with relatives are referred to as "kinship foster children"; the relatives with whom the kinship foster children are placed are referred to as "kinship foster parents." Current OCFS removal regulations generally do not differentiate between kinship foster parents and non-kinship foster parents.

A local district may "in its discretion" remove a child from a foster parent's home. N.Y. Soc. Serv. L. §§ 383(2), 400(1). Under OCFS regulations, foster parents must be given two types of notice about their rights when a foster care agency proposes to remove a foster child from their care. First, foster parents must be provided "a statement of a foster parent's rights" in their foster care agreement. 18 N.Y. Comp. Codes R. & Regs. tit. 18, § 443.5(e) (2014). Second, when the removal of a foster child is proposed, at least ten days prior to the proposed removal the foster care agency must provide written notice to the foster parents of their rights, except in emergency situations. Id. § 443.5(a)(1). This written notification must advise the foster parent that they may request a pre-removal conference[1] with the social services official proposing the removal or a designated employee of their local

---

[1] The pre-removal conference is sometimes referred to as an "independent review." (See, e.g., Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment Against Defendant John Johnson, ECF No. 123 at 7.) The Court uses the term "pre-removal conference" for the sake of consistency and precision.

district. Id. § 443.5(a)(2). Before the conference, the official holding the conference must send the foster parent notice of the conference date. Id. § 443.5(b).

The conference must be held within ten days of being requested. Id. At the conference, the foster parents, who may or may not be represented by legal counsel, may be advised of the reasons for the removal, and may contest the removal. Id. § 443.5(a)(2). The official holding the conference must send the foster parent and their representatives a written decision (a "Decision After Conference") within five days. Id. § 443.5(c). The decision must inform the foster parent of their ability to appeal the removal at a fair hearing conducted by OCFS. Id. § 443.5(c). The foster child remains in the kinship foster home until three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later. Id. § 443.5(d).

A foster parent who receives an adverse determination at the pre-removal conference may request a post-removal administrative hearing before an OCFS officer who has not been involved in any way with the action in question. Id. §§ 358-5.6(a), 443.5(c) (2014). A foster parent who requests a hearing has the right to: the adjournment of the hearing; be represented by an attorney or other representative; have an interpreter at any hearing at no charge, if the appellant does not speak English or is deaf; appear and participate at the conference and hearing; explain the situation; offer documents as evidence; question witnesses; offer evidence in opposition to the evidence presented by the social services agency and to examine any documents offered by the social services agency; bring witnesses to present

4

written or oral evidence; receive necessary transportation or the reimbursement of transportation expenses, child care costs, and other necessary expenditures related to the hearing; and have the hearing held at a convenient time and place to the extent practicable.  Id. § 358-3.4.  The hearing officer may also elicit documents and testimony, and may question the parties and witnesses, particularly if it is difficult for the foster parent to question a witness.  Id. § 358-5.6(b)(3).

Following the hearing, the OCFS officer prepares a report containing a summary of the hearing and a recommended Decision After Hearing for review by the OCFS Commissioner or the Commissioner's designee.  Id. § 358-5.6(b)(9).  The Commissioner or their designee then issues the final decision (the "Decision After Hearing").  See N.Y. Soc. Serv. L. § 22(2).  A copy of the decision accompanied by written notice of the right to judicial review must be sent to the foster parent.  18 N.Y. Comp. Codes R. & Regs. tit. 18, § 358-6.1(c).  If the Decision After Hearing is adverse to the foster parent, they may seek judicial review in New York Supreme Court pursuant to article 78 of the New York Civil Practice Law and Rules.  N.Y. Soc. Serv. L. § 22(9)(b).

B.    Factual History[2]

Ameena B. ("Ameena") was born in March 2002 to sixteen-year-old mother

Charia B., the grand-niece of Alice Haynes ("Ms. Haynes").[3]  (DSOF ¶¶ 1-2; PSOF

¶¶ 2, 10.)  On April 28, 2003, ACS took Ameena into its custody, alleging that

Ameena's mother had neglected her.  (PSOF ¶¶ 16-18.)  Ameena was then placed in

the care of an unrelated foster parent.  (PSOF ¶ 18.)  On August 8, 2004, a Family

Court judge ordered that Ameena, then two years old, be placed with Ms. Haynes,

and on September 24, 2004 she came to live with Ms. Haynes and her two adopted

children.  (DSOF ¶ 2; PSOF ¶¶ 6-8, 37.)

On or about June 7, 2005, the ACS case worker supervising Ameena's foster

care told Ms. Haynes that ACS would be mailing her a 10-day notice regarding the

planned non-emergency removal of Ameena from Ms. Haynes's home.  (DSOF ¶ 3.)

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with these motions and their supporting declarations and exhibits.  (See John Johnson's Statement of Material Facts, ECF No. 118 ("DSOF"); Plaintiff's Statement Pursuant to Rule 56.1, ECF No. 121 ("PSOF"); State Defendants' Response to Plaintiff's Statement of Material Facts, ECF No. 130 ("SDRSOF"); Plaintiff Alice Haynes's Response to John Johnson's Statement of Material Facts, ECF No. 134 ("PRSOF"); Defendant Johnson's Counterstatement to Plaintiff's Additional Statements of Material Fact, ECF No. 142 ("DRSOF").)  The Local Rule 56.1 statements here are far from models of clarity, and the Court has painstakingly reviewed them.  The Court cites to the parties' respective Local Rule 56.1 statements only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counterstatement supported by citation to evidence that would be admissible.  See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004).  The Court generally recites only those facts relevant to its decision, but also includes some factual allegations that are not material to the claims asserted against Johnson but that are important to understanding the context for this case.  Citations to a paragraph in a 56.1 counterstatement are intended to direct readers both to the counterstatement itself as well as to the corresponding statement countered by it.

[3] Alice Haynes is now deceased, having passed away subsequent to the commencement of this suit.  (See ECF No. 85.)

The reason for the removal was an investigation of an allegation that a red mark on Ms. Haynes's daughter's face might have been caused by child abuse.[4]  (PSOF ¶ 59.)

Ms. Haynes told the ACS case worker to take Ameena before the period expired so that she could avoid the anxiety that would be caused by a drawn-out removal process.  (DSOF ¶ 3.)  Ameena was then removed from Ms. Haynes's care on June 10, 2005.  (DSOF ¶ 4; PSOF ¶ 72.)  Upon removing Ameena, an ACS employee handed Ms. Haynes a form entitled "Notice of Removal," which stated that Ms. Haynes could request a pre-removal conference.  (DSOF ¶¶ 5-6; PSOF ¶¶ 73-74.)  Ms. Haynes verbally objected to the removal and refused to sign a document indicating that she had waived the ten-day notice, but did not ask the caseworker not to remove Ameena until after she had requested a pre-removal conference.  (See PSOF ¶¶ 69, 75.)

Ms. Haynes requested a pre-removal conference (PSOF ¶ 75), which was held on June 23, 2005 (PSOF ¶ 77; PRSOF ¶ 7).  On July 11, 2005, ACS issued a written decision determining that Ameena had been correctly removed.  (DSOF ¶ 8; PSOF ¶ 83.)

Sometime between then and early August 2005,[5] Ms. Haynes requested a post-removal administrative hearing.  (SDRSOF ¶ 89; PRSOF ¶ 273; DRSOF ¶

---

[4] The red mark was later determined to have been caused by a shrimp allergy.  (PSOF ¶ 60.)

[5] Ms. Haynes asserts both that she requested an administrative hearing within two weeks of the Decision After Conference (PSOF ¶ 89) and that she requested the hearing in August 2005 (PRSOF ¶ 273).  However, OCFS documents indicate that Ms. Haynes's letter was dated August 5, 2005, and it is stamped as "received" on September 9, 2005.  (Declaration of Beth Mancini in Support of State Defendants' Motion for Summary Judgment, ECF No. 120 ¶ 8 & ex. 1.)

273.) Her request was stamped as received by OCFS on September 9, 2005. (SDRSOF ¶ 89; PRSOF ¶ 9.) The hearing, which was held by an administrative law judge, commenced on October 27, 2005, but was adjourned because the ACS case worker was not available to testify. (See DSOF ¶¶ 11, 15; SDRSOF ¶¶ 90-91, 95.) When asked whether she objected to an adjournment, Ms. Haynes replied, "[i]t cannot be helped." (PRSOF ¶ 12; Declaration of Robert L. Kraft, ECF No. 119 ex. 1 at 4.) The hearing resumed on November 30, 2005. (DSOF ¶ 15; PSOF ¶ 94.) At the resumed hearing, Ms. Haynes was represented by counsel. (DSOF ¶ 15.)

On February 2, 2006, a designee of the OCFS Commissioner determined that the City's removal of Ameena from Ms. Haynes's care had been arbitrary, capricious, and an abuse of discretion, and he ordered an evaluation of the appropriateness of returning Ameena to Ms. Haynes's home. (DSOF ¶ 18; PSOF ¶¶ 98, 102-03.)

John Johnson was the OCFS Commissioner at the time the above events occurred, as he served as Commissioner from 1998 until November 2006. (DSOF ¶ 19; DRSOF ¶ 210.) As OCFS Commissioner, Johnson was responsible for monitoring local districts for child welfare and foster care. (PSOF ¶ 211; DRSOF ¶ 211.) While Commissioner, Johnson kept informed about legal issues concerning OCFS through executive staff meetings, legislative hearings, OCFS's legal unit, and OCFS's Office of Community Development. (DSOF ¶¶ 21-22.) Johnson participated in developing regulations for foster care hearings (PSOF ¶ 214; DRSOF ¶ 214), but he did not personally sign off on or approve any Decisions After Hearing while

8

serving as Commissioner (PSOF ¶ 29). While Commissioner, Johnson created the Bureau of Special Hearings, which presides over administrative hearings in which foster parents challenge the removal of foster children from their care. (SDRSOF ¶¶ 231-32.)

C.     Procedural History

Ms. Haynes filed this action individually and as next friend of Ameena B. on February 21, 2006, seeking damages, declaratory relief, and injunctive relief for alleged violations of the Constitution and New York law by defendants the City of New York (the "City"), ACS, ACS Commissioner John Mattingly, several employees of ACS, and John Johnson. (ECF No. 1 ("Compl.").) The complaint alleged that defendants illegally seized and detained Ameena from Ms. Haynes without probable cause or due process of law, and that defendants' procedures for the removal of kinship foster children violated the due process rights of kinship foster parents. (Compl. ¶ 1.) Judge Thomas P. Griesa was initially assigned to the case. (ECF No. 7.)

Ms. Haynes filed an amended complaint on March 13, 2006 (ECF No. 6), which Johnson answered on April 14, 2006 (ECF No. 22) and the remaining defendants answered on April 20, 2006 (ECF No. 24). In his answer, Johnson asserted as affirmative defenses, inter alia, qualified immunity and lack of personal involvement. (ECF No. 22 ¶¶ 52-53).

In late February 2006, Ms. Haynes moved for a preliminary injunction seeking the return of Ameena to plaintiff's care (ECF Nos. 2, 5), which was opposed

9

by the City and Ameena's law guardian (ECF Nos. 14-15).  Judge Griesa denied this motion at a hearing on April 11, 2006.  (ECF No. 32.)  Ms. Haynes requested reconsideration of the Court's decision (ECF No. 25), and Judge Griesa referred the matter to magistrate Judge Theodore Katz to hold an evidentiary hearing regarding the return of Ameena to Ms. Haynes's care (ECF No. 41).  The evidentiary hearing was never held because ACS returned Ameena to Ms. Haynes, and the motion for a preliminary injunction was denied as moot on July 31, 2006.  (ECF No. 51.)

On March 13, 2007, the Court granted Ms. Haynes leave to file a second amended complaint (ECF No. 60), and she did so on March 19, 2007 (ECF No. 61 ("2d Amended Compl.").)  The second amended complaint (hereinafter, the "complaint") alleges six causes of action based on violations of the Constitution, two causes of action based on violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132 et seq., and several causes of action under New York state law.  (See 2d Amended Compl.)  Johnson answered the complaint on March 30, 2007 (ECF No. 62), again asserting qualified immunity and lack of personal involvement as affirmative defenses (see id. at ¶¶ 62-63).  The remaining defendants answered on April 17, 2007.  (ECF No. 63.)

On November 12, 2009, Judge Griesa appointed a guardian ad litem for Ameena B. to evaluate a proposed settlement of her claims against all defendants except Johnson in exchange for a monetary payment.  (ECF Nos. 66-67.)  This settlement was then approved.  (ECF Nos. 72-73, 75, 78-79.)

Ms. Haynes died on or about March 8, 2013, and defendants filed a suggestion of death.  (ECF No. 85.)  The case was reassigned to this Court on June 6, 2013.  (ECF No. 90.)  The Court granted the motion of Dirk Haynes ("plaintiff"), Alice Haynes's son and the administrator of her estate, to be substituted to pursue the claims not otherwise settled or extinguished by Alice Haynes's death.  (ECF No. 99).

The parties filed cross-motions for summary judgment on January 31, 2014.  (ECF Nos. 114, 117.)  The motions became fully briefed on April 23, 2014.  (ECF Nos. 140-41.)

On May 6, 2014, plaintiff voluntarily dismissed all of his claims against Johnson in his official (but not his individual) capacity, as well as all of his claims against Sheila Poole, Johnson's successor as OCFS Commissioner.  (ECF No. 144.)  That same day, plaintiff settled all claims against the other defendants.  (ECF Nos. 145-46.)  Earlier, on February 6, 2014, the Court appointed a guardian ad litem for Ameena for the purpose of evaluating whether it would be appropriate for Ameena's counsel to agree to dismiss the claims asserted against Johnson on Ameena's behalf.  (ECF Nos. 125, 151.)  The guardian ad litem reviewed the information produced during discovery in this case and discussed this issue with Ameena and her counsel, and conferred with counsel for Mr. Haynes and counsel for Johnson.  On September 2, 2014, the guardian ad litem filed a letter stating the dismissal of Ameena's claims against Johnson was appropriate.  (ECF No. 153.)  Ameena has no live claims remaining.  The only live claims remaining are plaintiff's claims for damages

11

against Johnson in his individual capacity. Specifically, those claims seek damages due to alleged violations of the Due Process Clause of the Fourteenth Amendment (plaintiff's First, Second, Third, and Fourth Causes of Action), the Fourth Amendment (plaintiff's Fifth Cause of Action), state tort law (plaintiff's Sixth and Seventh Causes of Action), article 78 of the New York Civil Practice Law and Rules (plaintiff's Eighth Cause of Action), Title II of the Americans with Disabilities Act (plaintiff's Ninth and Tenth Causes of Action), and New York's Human Rights Law (plaintiff's Eleventh Cause of Action.) (2d Amended Compl. ¶¶ 71-130.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

12

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—that is, "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007). If the evidence favoring the non-moving party is "merely colorable

. . . or is not significantly probative, summary judgment may be granted."

Anderson, 477 U.S. at 586.

III.    DISCUSSION

Johnson has moved for summary judgment as to all claims against him.  He asserts that there is no triable issue as to his personal involvement in the relevant events and that in any event he is entitled to qualified immunity.  The Court agrees.

A.    Personal Involvement

It is well settled that a defendant cannot be liable for damages under § 1983 unless a plaintiff can demonstrate that defendant's "personal involvement" in an alleged constitutional deprivation.  Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)).  The fact that an individual "held a high position of authority" is on its own insufficient to establish personal involvement.  See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004) (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)); see also Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam) (a "mere linkage in the . . . chain of command" is insufficient to implicate a state official in a § 1983 claim (quotation and internal quotation marks omitted)).  Plaintiff must establish that defendant violated the Constitution "through [their] own individual actions."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

Before Iqbal, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was Colon v.

Coughlin, 58 F.3d 865 (2d Cir. 1995).  Under Colon, the personal involvement of a supervisory defendant could be established via five distinct routes:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring."

Id. at 873 (citation omitted).  However, in Iqbal, the Supreme Court established that the required showing of personal involvement "will vary with the constitutional provision at issue."  Iqbal, 556 U.S. at 676.  For instance, a claim for invidious discrimination requires the plaintiff to prove and plead that the defendant acted with discriminatory purpose.  Id.

Courts in this district have disagreed over whether the Colon categories still apply in light of Iqbal, and the Second Circuit has yet to provide guidance as to this issue.  See, e.g., Doe v. Whidden, 557 Fed. App'x 71, 72 n.1 (2d Cir. 2014) (declining to decide how Iqbal affects the standards articulated in Colon for establishing supervisory liability); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (same); Qasem v. Toro, 737 F. Supp. 2d 147, 151 (S.D.N.Y. 2010) ("The Second Circuit has not yet addressed how Iqbal affects the five categories of conduct that give rise to supervisory liability under Colon."); D'Olimpio v. Crisafi, 718 F. Supp.

2d 340, 347 (S.D.N.Y. 2010) (collecting cases).  For this reason, the Court's analysis assumes that all of the Colon categories continue to apply.

Plaintiff has, in short, proffered argument but not proof that creates a triable issue.  Plaintiff argues that Johnson was personally involved in the alleged violations of Ms. Haynes's constitutional rights under theories based on the first and third Colon categories.  With regard to the first Colon category, plaintiff contends that Johnson directly participated in the hearing process, in delaying the scheduling of Ms. Haynes's post-removal administrative decision, and in the issuance of the Decision After Hearing.  With regard to the third Colon category, plaintiff contends that Johnson created policies or customs of delaying hearings and not immediately returning a kinship foster child to their kinship foster parents following a determination that a removal was arbitrary and capricious.  Plaintiff also contends that Johnson failed to remedy the existing policy of not providing a pre-deprivation hearing.  However, plaintiff has failed to create a triable issue of fact as to Johnson's personal involvement under either Colon category.

There is no evidence that Johnson participated in the post-removal hearing or even that he was aware of it at the time.  Ms. Haynes's hearing was presided over by an administrative law judge (SDRSOF ¶ 95), and the ultimate determination was made by a designee of Johnson, not Johnson himself (PSOF ¶¶ 98, 102-03).  Indeed, plaintiff does not dispute that while he was Commissioner, Johnson did not sign off on or approve any Decisions After Hearing at all.  (PRSOF ¶ 29.)  Further, there is no evidence that Johnson took any action personally to

affect the scheduling of the hearing. There is therefore no basis for establishing supervisory liability under the first <u>Colon</u> factor.

As to the third <u>Colon</u> category, plaintiff has again proffered argument and not proof that creates a triable issue. Plaintiff argues that Johnson created a policy of not immediately returning kinship foster children to kinship foster parents after a determination that a removal was arbitrary and capricious. (<u>See</u> Plaintiff's Memorandum of Law in Opposition to Defendant Johnson's Motion for Summary Judgment, ECF No. 133 at 15-16 ("Pl.'s Mem. in Opp.").) Yet as evidence for this alleged change in policy, plaintiff points not to factual allegations supported by citations to the record, but rather to two reported decisions: <u>Matter of Sherman v. Johnson</u>, 20 A.D.3d 430, 430-31 (N.Y. App. Div. 2005), and <u>Mundie v. Nassau Cnty. Dep't of Soc. Servs.</u>, 88 Misc. 2d 273 (N.Y. Sup. Ct. 1976). (<u>See</u> Pl.'s Mem. in Opp. at 15-16.)

Neither of these decisions themselves provides evidence of a change in policy during Johnson's tenure, nor do they lead to such an inference. First, <u>Mundie</u> was issued over 20 years before Johnson took over as OCFS Commissioner, and thus even if the opinions could establish a change in OCFS policy, they could show only that there was a change sometime between 1976 and 2005—they do not establish or lead to an inference that such a change occurred on Johnson's watch, which is the relevant question. Second, <u>Mundie</u> provides no evidence of the purported OCFS policy change because there <u>the court</u> ordered the return of the child after finding the removal was improper—the automatic return of the child was therefore not the

17

result of the Commissioner's policy, but rather court order. See Mundie, 88 Misc. 2d at 279. Plainly, this decision cuts against plaintiff's argument, since the reasonable inference is that if a policy to automatically return children had existed, this court order would have been unnecessary.

Plaintiff also argues that Johnson created a policy or practice of unreasonably delaying post-removal administrative hearings. (See Plaintiff's Memorandum of Law in Reply to Defendant Johnson's Opposition to Plaintiff's Motion for Partial Summary Judgment Against Defendant John Johnson, ECF No. 136 at 6-7.) This argument, however, is not supported by any admissible evidence.

Lastly, plaintiff argues that Johnson was personally involved in violating Ms. Haynes's constitutional rights through omission—that is, a failure to act. The assertion is that because Johnson failed himself to remedy OCFS's policy of not providing a pre-removal hearing, instead providing a conference, he was personally involved. (See Pl.'s Mem. in Opp. at 2-7.) As an initial matter, it is not at all clear that an omission of the type alleged here could constitute or raise a reasonable inference of "personal" involvement without some showing of actual awareness and an affirmative decision not to act. In any event, this argument fails because Johnson's alleged omission in this regard did not result in any constitutional deprivation. As discussed below in the analysis of qualified immunity, no court has ever held that a pre-removal hearing is constitutionally required, and several courts including the Supreme Court have stated that processes similar to those at issue are constitutionally sufficient.

18

Here, the undisputed facts show only that Johnson kept himself informed of legal issues concerning OCFS through multiple sources, and that he participated in the development of regulations for foster care hearings.  There is simply no evidence that Johnson was aware of <u>Ms. Haynes's</u> case prior to the instant litigation, let alone that he did anything to affect it through any determined affirmative act or decision not to act.  Johnson cannot be liable for violating Ms. Haynes's constitutional rights.

B.    <u>Qualified Immunity</u>

With regard to the removal of Ameena and the procedures relating to that removal, Johnson is also not liable to plaintiff because he is entitled to qualified immunity.  Plaintiff has failed to raise a triable issue to the contrary.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986), and it "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," <u>Pearson</u>, 555 U.S. at 231.  In a § 1983 lawsuit, "defendant bears the burden of pleading and proving the affirmative defense of qualified immunity."  <u>Blissett v.</u>

19

Coughlin, 66 F.3d 531, 539 (2d Cir. 1995). Summary judgment dismissing a claim on the basis of a qualified immunity defense may be granted

> if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-step process for determining whether a defendant is entitled to qualified immunity. First, the Court must ask whether "the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. Second, if a constitutional right was violated, the Court must determine whether that right was "clearly established" at the time of the violation; if not, the officer is entitled to qualified immunity. Id. at 201.

Because the Saucier procedure often forced courts to decide difficult constitutional questions that did not ultimately determine whether a defendant was entitled to qualified immunity, it was the subject of much criticism, including from the Supreme Court itself. See Pearson v. Callahan, 555 U.S. 223, 235 (2009) (collecting cases). As a result, in Pearson v. Callahan, the Supreme Court backed away from Saucier and held the two-step procedure to no longer be mandatory. See id. at 818-22.

20

In light of <u>Pearson</u>, courts may now "avoid reaching difficult questions of constitutional law where there is no question that an objectively reasonable government official would not have known his conduct was in violation of the Constitution, that is, where the right asserted by the plaintiff is not clearly established." <u>Hilton v. Wright</u>, 673 F.3d 120, 126 (2d Cir. 2012). "A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Jackler v. Byrne</u>, 658 F.3d 225, 242 (2d Cir. 2011) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)) (alterations in original). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Id.</u> at 243 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999)) (internal quotation marks omitted).

Plaintiff argues that Johnson should have known that the regulations and procedures in effect when he took office violated kinship foster parents' due process rights. He argues that, in particular, Johnson deprived Ms. Haynes of due process by failing to provide a pre-removal hearing, failing to order the immediate return of Ameena to Ms. Haynes's foster home in the Decision After Hearing, and delaying the scheduling of the hearing.

To establish a claim under the Due Process Clause a party must demonstrate that "(a) there has been a deprivation of liberty or property in the constitutional sense; and (b) the procedures used by the state to effect this deprivation were

constitutionally inadequate." Rivera v. Marcus, 696 F.2d 1016, 1022 (2d Cir. 1982) (citations omitted). With regard to (a), the Second Circuit has held that a kinship foster parent has a protectable liberty interest in their relationship with their kinship foster children, and the kinship foster parent is therefore entitled to due process when government actors seek to remove a kinship foster child from their care. Id. at 1025-26. A reasonable person in Johnson's position in 2005 would therefore have known that Ms. Haynes had a constitutional liberty interest in her relationship with Ameena. But with regard to (b), it was not clearly established in 2005 that New York's procedures for the removal of kinship foster children from kinship foster care were constitutionally inadequate.

First, with regard to whether the removal procedures violated due process as a general matter, in the 1982 case Rivera v. Marcus, the Second Circuit held that Connecticut's pre-removal process failed to adequately protect the due process rights of foster parents. 696 F.2d at 1027-28. At the time, Connecticut permitted foster parents to challenge a removal decision at an administrative hearing where they were not permitted to bring legal counsel or to confront or cross-examine witnesses, and at which they were not guaranteed to be heard at all. Id. at 1019. The decision following this hearing was not required to be in writing or even explained to the foster parent, and it was not subject to judicial review. Id. After concluding that these procedures were constitutionally inadequate, the Second Circuit determined that the following procedural safeguards, which were imposed by the district court to remedy the constitutional violation, were "commensurate

with the scope of the constitutional infraction," and therefore sufficient to provide

due process: (1) timely and adequate notice of the reasons for termination; (2) an

opportunity to retain counsel; (3) upon request, and in the absence of exceptional

circumstances, a pre-removal hearing; (4) an opportunity to confront and cross-

examine witnesses; (5) an impartial decisionmaker; and (6) a written statement of

the decision and a summary of the evidence in support thereof. Id. at 1029-30.

By contrast, in Smith v. Org. of Foster Families for Equality & Reform, 431

U.S. 816 (1977) ("OFFER"), a 1977 case that serves as a precursor to Rivera, the

Supreme Court held that New York's statutory and regulatory procedures for the

removal of foster children from non-kinship foster homes satisfied the requirements

of due process, id. at 855-56.  There, the Court found that a removal with the

following characteristics satisfied due process: (1) ten days' advance notice prior to

removal; (2) a pre-removal conference before a Social Services Department official at

which the foster parent could appear with counsel, be advised of the reasons for

removal, and submit reasons why the child should not be removed;[6] (3) a decision

issued within five days of the conference, notice of which would be sent to the foster

parent; (4) an ability to appeal the decision to the Department of Social Services,

where a full adversary administrative hearing would take place, and the ability to

---

[6] New York City provided, at the foster parent's request, a substitute for or supplement to the agency conference known as an "independent review," which was more formal and trial-like.  See id. at 849 n.56.

obtain judicial review of the determination at that administrative hearing. Id. at 829-30.

Plaintiff has failed to create a triable issue of fact regarding whether a reasonable person in Johnson's position would have known in 2005 that New York's policies and procedures for the removal of kinship foster children from kinship foster homes failed to adequately protect the due process rights of kinship foster parents. The removal procedures did not clearly violate due process under Rivera, because unlike the pre-removal process found to be constitutionally defective by the Second Circuit, New York's pre-removal procedures in 2005 permitted foster parents to be represented by counsel, gave foster parents an opportunity to be heard and to contest the removal, provided for a written decision required to be sent to the foster parents within 5 days of the pre-removal conference, and provided for a form of review. Further, New York's removal procedures in 2005 contained numerous procedural safeguards analogous to those found by the Second Circuit in Rivera to be sufficient to protect the due process rights of kinship foster parents. With respect to timely and adequate notice of the reasons for termination, the procedures provided foster parents with ten days' notice prior to removal of the right to request a conference at which they could be advised of the reasons for removal, and which must have been held within ten days of being requested. 18 N.Y. Comp. Codes R. & Regs. tit. 18, § 443.5(a)(1)-(2). With regard to an opportunity to retain counsel, the procedures permitted foster parents to be represented by counsel both at the pre-removal conference and at the post-removal administrative hearing. Id. §§ 358-3.4,

24

443.5(a)(2). With regard to a pre-removal hearing upon request and in the absence of exceptional circumstances, the procedures provided for a pre-removal conference, which although not a full-blown adversarial hearing permitted the parents an opportunity to be heard. See id. § 443.5(a)-(b). The procedures also permitted kinship foster parents to confront and cross-examine witnesses at the post-removal administrative hearing. Id. § 358-3.4(g)-(h). With regard to an impartial decisionmaker, post-removal conferences were conducted by OCFS officers not involved with the actions before them. Id. § 358-5.6(a). And lastly, the process provided for written statements of decision both after the pre-removal conference and the post-removal administrative hearing. Id. §§ 358-6.1(c), 443.5(c).

Moreover, New York's removal procedures in 2005 are very similar to those found to be constitutionally sufficient in OFFER, in that they provide for:

1)  at least ten days' notice prior to removal, compare 18 N.Y. Comp. Codes R. & Regs. tit. 18, § 443.5(a)(1) (2014) ("Such notification must be given at least 10 days prior to the proposed effective date of the removal . . . ."), with OFFER, 431 U.S. at 829 ("The agency is required, except in emergencies, to notify the foster parents in writing 10 days in advance of any removal.");

2)  a pre-removal conference at which the foster parent may appear with counsel, be advised of the reasons for removal, and submit reasons why the child should not be removed, compare 18 N.Y. Comp. Codes R. & Reg. tit. 18, § 443.5(a)(2) (2014) ("[F]oster family parents . . . may request a

a conference . . . at which time the foster parents, with or without a

representative, may appear to have the proposed action reviewed, be

advised of the reasons therefor and be afforded an opportunity to submit

reasons why the child should not be removed." ), with OFFER, 431 U.S. at

829-30 ("The foster parent may appear with counsel at the conference,

where he will be advised of the reasons (for the removal of the child), and

be afforded an opportunity to submit reasons why the child should not be

removed." (quotation omitted));

3) a written decision within five days of the conference that is sent to the

foster parent, compare 18 N.Y. Comp. Codes R. & Reg. tit. 18, § 443.5(c)

("The social services official shall render and issue his or her decision as

expeditiously as possible, but not later than five days after the conference.

Written notice of this decision must be sent to the foster family parents

and their representative, if any . . . ."), with OFFER, 431 U.S. at 830 ("The

official must render a decision in writing within five days after the close of

the conference, and send notice of his decision to the foster parents and

the agency."); and

4) an ability to appeal the decision at an administrative hearing, and

following that, in New York state court, compare N.Y. Soc. Serv. L. § 22(9)

(right to appeal decision at administrative hearing in New York state

court), and 18 N.Y. Comp. Codes R. & Regs. tit. 18, § 443.5(c) (right to

appeal removal decision and request a fair hearing with OCFS), with

26

OFFER, 431 U.S. at 830 ("[T]he foster parent may appeal to the

Department of Social Services for a 'fair hearing,' that is, a full adversary

administrative hearing . . . which is subject to judicial review . . . .").

For these reasons, New York's removal procedures in 2005 did not as a general

matter violate clearly established law regarding the due process rights of kinship

foster parents.

With regard to the failure to provide a pre-removal hearing, "[t]he judicial

model of an evidentiary hearing is neither a required, nor even the most effective,

method of decisionmaking in all circumstances," Mathews v. Eldridge, 424 U.S. 319,

349 (1976) (internal quotation omitted), and no court has ever held New York's pre-

removal process to be constitutionally insufficient.  While Rivera established that a

"pre-removal hearing" may be a feature of a process sufficient to protect due process

rights, the opinion does not state that a pre-removal hearing is necessary to do so,

nor does it specify whether the "pre-removal hearing" referred to by the opinion is a

full adversarial hearing of the type advocated for by plaintiff.  See 696 F.2d at 1028-

29.  Further, in OFFER, the Supreme Court declined to require New York State to

hold automatic pre-removal hearings, particularly because such a requirement

"would impose a substantial additional administrative burden on the State."  431

U.S. at 850-51, 855.  A reasonable OCFS Commissioner in 2005 therefore would not

have known that the failure to provide a pre-removal hearing would have violated

any clearly established law.

With regard to plaintiff's argument that the failure to immediately return Ameena to Ms. Haynes's foster home was a clear violation of due process, no court has ever held that where an OCFS hearing finds that the removal of a child in kinship foster care was arbitrary or capricious, due process requires automatic return of the child to the kinship foster parent. And in fact, in 2010, a court rejected this very argument. See Renaud v. Mattingly, No. 09 CV9303 (GBD), 2010 U.S. Dist. LEXIS 83799, at *24-26 (S.D.N.Y. Aug. 9, 2010). It was, however, clearly established law in 2005 that the needs and interests of a child take precedence over those of the foster parent in making decisions about custody. See, e.g., Bennett v. Jeffreys, 356 N.E.2d 277, 281 (N.Y. 1976) (where "extraordinary circumstances" are present, "when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody"); Allen v. Farrow, 215 A.D.2d 137, 138 (N.Y. App. Div. 1995) ("Whenever the rights of a child are implicated in a lawsuit, the paramount consideration is the welfare and best interest of that child, and not the asserted rights of the parent." (internal citations omitted)); Matter of James P. W. v. Eileen M. W., 136 A.D.2d 549, 550 (N.Y. App. Div. 1988) (court must "resolve custody disputes, not out of sympathy for the circumstances of the parent, but out of concern for the best interest and welfare of the child" (quoting Thomas J. D. v. Catharine K. D., 79 A.D.2d 1015, 1017 (N.Y. App. Div. 1981))). For these reasons, it was not apparent in 2005 that due process requires the automatic return of a kinship foster child to their foster parent following a determination that a removal was improper—nor is it clear that due process requires it now.

28

With regard to the delay in scheduling the post-removal administrative hearing, the Second Circuit has held that "[w]here there has been an emergency removal of a child from a parent's custody without a hearing, due process requires that the state procedures provide the parent an opportunity to be heard at a reasonably prompt time after the removal." Gottlieb v. Cnty. of Orange, 84 F.3d 511, 520 (2d Cir. 1996). However, the meaning of "reasonably prompt" under Second Circuit law is not entirely clear. In Duchesne v. Sugarman, 566 F.2d 817 (2d Cir. 1977), the Second Circuit held that a delay of 27 months before a parent was afforded an opportunity to be heard following a removal violated the parent's due process rights, id. at 828. By contrast, in Balbuena v. Mattingly, No. 05 Civ. 2986 (TPG), 2007 U.S. Dist. LEXIS 72517 (S.D.N.Y. Sept. 28, 2007), a court held that a delay of 70 days in the issuance of a Decision After Hearing did not violate a kinship foster parents' due process rights, id. at *25-27. The Court noted that the facts "together suggest[ed] no urgency mandating a more speedy decision," given that the plaintiff had waited 61 days after the Decision After Independent Review to request a hearing, the hearing took place over two months, and plaintiff had not made any contemporaneous objections to the delay. Id. Courts in other circuits have variously held that under certain circumstances delays in holding post-removal proceedings of 65 hours, 17 days, 7 weeks, and 4 months fail to adequately protect due process. See Swipies v. Kofka, 419 F.3d 709, 715 (8th Cir. 2005) (17 days); Jordan v. Jackson, 15 F.3d 333, 351 (4th Cir. 1994) (65 hours); Weller v. Dep't

of Soc. Servs. for the City of Balt., 901 F.2d 387, 396 (4th Cir. 1990) (4 months);

Brown v. Daniels, 128 Fed. App'x 910, 915-16 (3d Cir. 2005) (7 weeks).

Here, there was a delay of at most 3 months and 17 days between the request for the hearing and the initial hearing date,[7] which falls over 23 months shy of the delay found constitutionally intolerable in Duchesne.  Further, as in Balbuena, here there is an absence of factual allegations suggesting "urgency mandating a more speedy decision," 2007 U.S. Dist. LEXIS 72517 at *27, such as evidence of contemporaneous objections to the delay.  Lastly, although courts in other circuits have held that delays of this length of time failed to adequately protect due process, the large amount of variation in these holdings suggests not that it was clearly established law that such delays violated due process, but rather that the determination of whether a given delay violates due process is a highly context-dependent and case-specific inquiry.  For these reasons, it cannot be said that the delay between Ms. Haynes's request and the hearing violated clearly established law.

For the above reasons, "no rational jury could fail to conclude that it was objectively reasonable for [Johnson] to believe that [he was] acting in a fashion that

---

[7] This assumes arguendo that Haynes requested a hearing on the date ACS issued its Decision After Conference. As stated above, Ms. Haynes asserts both that she requested the hearing within two weeks of the Decision After Conference and that she requested the hearing in August 2005, and OCFS documentation indicates that the request was dated August 5, 2005 and stamped as "received" by OCFS on September 9, 2005. See note 5, supra.

did not violate a clearly established right," In re State Police Litig., 88 F.3d at 123, and Johnson is therefore entitled to qualified immunity.

      C.    Other Reasons for Dismissal

      Plaintiff's Fifth Cause of Action seeks relief for a violation of Ameena's right to be free of unlawful searches and seizures under the Fourth Amendment. (2d Amended Compl. ¶¶ 103-06.) But any potential Fourth Amendment claim in this case belongs to Ameena, not plaintiff. Balbuena, 2007 U.S. Dist. LEXIS 72517 at *28. Further, the removal of a foster child from the home of a kinship foster parent is not a Fourth Amendment seizure. See Rivera v. Mattingly, No. 06 Civ. 7077 (TPG), 2011 U.S. Dist. LEXIS 102903, at *30-33 (S.D.N.Y. 2011) ("[P]laintiffs have not pointed to any Second Circuit cases holding that Fourth Amendment seizures occur when foster children in the state's legal custody are moved from one foster home to another."). Accordingly, plaintiff's Fourth Amendment claim fails as a matter of law, and must be dismissed.

      Plaintiff's Sixth and Seventh Causes of Action seek relief under state tort law. However, plaintiff does not contend that Johnson's conduct violated clearly established tort law, nor is there any reason to believe that it did. Johnson is therefore entitled to qualified immunity against these claims, and they are dismissed.

      Plaintiff's Eighth Cause of Action seeks relief under Article 78 of the New York Civil Practice Law and Rules. (2d Amended Compl. ¶¶ 116-20.) This Court lacks jurisdiction to adjudicate article 78 claims. Cartagena v. City of New York,

257 F. Supp. 2d 708 (S.D.N.Y. 2003) ("The cases that have addressed the issue have consistently declined to exercise supplemental jurisdiction over Article 78 claims." (citations omitted)).  Accordingly, this claim is dismissed.

Finally, plaintiff's Ninth and Tenth Causes of Action seek relief under Title II of the ADA, and Plaintiff's Eleventh Cause of Action seeks relief under the New York Human Rights Law.  As plaintiff has failed to provide any briefing on these causes of action, they are dismissed for failure to prosecute under Rule 41 of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 41(b).

IV.        CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is DENIED, and defendant's motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motions at ECF Nos. 114 and 117 and to terminate this action.

SO ORDERED.

Dated:     New York, New York
           September 2?, 2014

_____
           KATHERINE B. FORREST
           United States District Judge

32